# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Zachary J. E.,                                  Case No. 22-cv-101 (TNL)

                    Plaintiff,

v.                                                    **ORDER**

Kilolo Kijakazi,
Acting Commissioner of Social Security,

                    Defendant.

Benjamin L. Reitan and Jacob P. Reitan, Reitan Law Office, PLLC, 1454 White Oak
Drive, Chaska, MN 55318 (for Plaintiff); and

Ana H. Voss, Assistant United States Attorney, 300 South Fourth Street, Suite 600,
Minneapolis, MN 55415; and Elvi Jenkins, James D. Sides, and Michael Moss, Special
Assistant United States Attorneys, Social Security Administration, 6401 Security
Boulevard, Baltimore, MD 21235 (for Defendant).

# I. INTRODUCTION

Plaintiff Zachary J. E. brings the present case, contesting Defendant
Commissioner of Social Security's denial of his applications for disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and
supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et
seq.*[1] The parties have consented to a final judgment from the undersigned United States

---

[1] It is not entirely clear whether Plaintiff is challenging the denial of one or both of these applications. The
Complaint refers to a single application. Compl. ¶¶ 4 (discussing jurisdiction "to review a decision denying
Plaintiff's *application* for Social Security Disability for lack of disability" (emphasis added)), 6 ("The Plaintiff filed
*an application* for disability benefits with the Defendant . . . ." (emphasis added)), ECF No. 1. Plaintiff's
memorandum in support of his motion for summary judgment begins: "Plaintiff Zachary [J. E.] seeks reversal in this
case of the decision of the Commissioner denying his disability benefits under Title XVI and of [sic] of the Social

1

Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn.
LR 72.1(c).

This matter is before the Court on the parties' cross motions for summary
judgment. ECF Nos. 14. 20. Being duly advised of all the files, records, and proceedings
herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment,
ECF No. 14, is **DENIED**, and the Commissioner's Motion for Summary Judgment, ECF
No. 20, is **GRANTED**.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI asserting that he has been disabled since October
2015 due to, among other impairments, diabetes, neuropathy,[2] depression, anxiety, and
panic disorder.[3] Tr. 20, 115-16, 128-29, 141, 142, 143-44, 156-57, 169, 170; *see also* Tr.
174. Plaintiff's applications were denied initially and again upon reconsideration. Tr.
126, 139, 141, 142, 154, 167, 169, 170; *see also* Tr. 174.

Plaintiff appealed the reconsideration of his DIB and SSI determinations by
requesting a hearing before an administrative law judge ("ALJ"). Tr. 174, 222-23. The
ALJ held a hearing in December 2019, and issued an unfavorable decision. Tr. 174, 190;
*see generally* Tr. 174-191, 67-114. The Appeals Council granted Plaintiff's request for

---

Security Act." Pl.'s Mem. in Supp. at 1, ECF No. 15. Because the record reflects that Plaintiff filed applications for
both DIB and SSI, both were ultimately denied, and, for purposes of the instant motions, the applicable standards are
the same, the Court has addressed them both. *See* Def.'s Mem. in Supp. at 4 n.2 ("Because the relevant Title XVI
regulations applying to Plaintiff's SSI claim mirror the Title II regulations applying to his [DIB] claim, the
Commissioner cites only the Title II regulations."), ECF No. 21.
[2] Diabetic neuropathy refers to "damage to the covering on . . . [the] nerves or the blood vessels that bring oxygen to
. . . [the] nerves" over time by high "blood glucose, or blood sugar," levels. *Diabetic Nerve Problems*, MedlinePlus,
U.S. Nat'l Lib. of Med., https://medlineplus.gov/diabeticnerveproblems.html (last accessed Mar. 6, 2023).
[3] Plaintiff also claimed disability on the basis of gastroparesis, asthma, and sleep apnea. Tr. 116, 129, 144, 157.
Plaintiff's assignments of error do not, however, relate to these conditions.

review, vacated the ALJ's decision, and remanded the case to the ALJ.  Tr. 20; *see generally* Tr. 198-99; *see also* Tr. 272-73.

The ALJ held a second hearing in April 2021, and again issued an unfavorable decision.  Tr. 20; *see generally* Tr. 20-40, 47-66.  Thereafter, Plaintiff again requested review from the Appeals Council, which was subsequently denied.  Tr. 1-4.

Plaintiff then filed the instant action, challenging the ALJ's decision.  *See generally* Compl.  The parties have filed cross motions for summary judgment.  ECF Nos. 14, 20.  This matter is now ready for a determination on the papers.

### III. ALJ'S DECISION

In relevant part, the ALJ found that Plaintiff had the severe impairments of diabetes mellitus type 1 with polyneuropathy and cutaneous abscess formation, panic disorder, and depression, and none of these impairments individually or in combination met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  Tr. 23-26. Again in relevant part, the ALJ considered whether Plaintiff met Listing 11.14B for peripheral neuropathy.  Tr. 24.  The ALJ appreciated that "this is a closer case" and essentially assumed that Plaintiff had the requisite marked limitation in physical functioning based on his "significant limitation in the amount of time on the feet, environmental limitations, exertional limitations, and handling/fingering limitations."  Tr. 24; *see* Tr. 24 ("[Plaintiff] may have a marked limitation in physical functioning."), ("This might fairly be considered a marked physical limitation").  The ALJ concluded, however, that Plaintiff did not have the required accompanying marked limitation in any

one of the areas of mental functioning and therefore his neuropathy did not meet Listing 11.14B.  Tr. 24.

As to Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had the residual functional capacity to perform sedentary work[4] "except that he could occasionally exert twenty pounds force and frequently ten [pounds]."  Tr. 26.  Plaintiff "could sit for about six hours out of eight and could stand and walk for about one hour [each] out of an eight-hour workday," Tr. 26; *see* Tr. 28, with certain postural and environmental limitations not relevant here and was "limited to work with only routine and predictable changes with only occasional and superficial interactions with others," Tr. 35; *see* Tr. 26-27 (limited "to work in an environment with routine, predictable changes" and "occasional interactions with others of a superficial nature, such as taking instructions, relaying information, and transferring materials").  Standing and walking were limited to "30-minute intervals."  Tr. 26.

Based on Plaintiff's age, education, work experience, and residual functional capacity as well as the testimony of a vocational expert, the ALJ found that Plaintiff was capable of performing the representative jobs of visual inspector in the knitting/clothing

---

[4]

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a); *accord* 20 C.F.R. § 416.967(a).

and wood industries and a coil inspector.  Tr. 39-40; *see* Tr. 63-65, 107-09.  Accordingly,

the ALJ concluded that Plaintiff was not under a disability.  Tr. 40.

## IV. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial

evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "It means—and means

only—such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Id.* (quotation omitted); *see also, e.g.*, *Austin v. Kijakazi*, 52 F.4th 723, 728

(8th Cir. 2022) ("Substantial evidence means less than a preponderance, but enough that

a reasonable mind might accept as adequate to support a conclusion." (quotation

omitted)); *Bowers v. Kijakazi*, 40 F.4th 872, 874-75 (8th Cir. 2022) (same); *Chismarich

v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (same).

This standard requires the Court to "consider both evidence that detracts from the

[ALJ's] decision and evidence that supports it."  *Boettcher v. Astrue*, 652 F.3d 860, 863

(8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021).  The ALJ's

decision "will not [be] reverse[d] simply because some evidence supports a conclusion

other than that reached by the ALJ."  *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9

F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).  "The court must

affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a

whole."  *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted).  Thus,

"[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent

positions from the evidence and one of those positions represents the ALJ's findings, the

court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

6

Plaintiff asserts that the ALJ erred by concluding that his neuropathy did not meet Listing 11.14B based on his marked limitation in concentrating, persisting or maintaining pace and by not including the standing, walking, and absenteeism limitations opined by his physician Harold Hellweg, D.O., in his residual functional capacity.

### A. Step Three: Listing 11.14B

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010) (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii); *see also, e.g.*, *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)); *see also, e.g.*, *Schmitt v. Kijakazi*, 27 F.4th 1353, 1359 (8th Cir. 2022); *Twyford v. Comm'r*, 929 F.3d 512, 517 (8th Cir. 2019). "An impairment meets a listing only if it 'meet[s] all of the specified medical criteria.'" *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016) (alteration in original) (quoting *Sullivan*, 493 U.S. at 530); *accord Schmitt*, 27 F.4th at 1358. "The claimant has the burden of proving that his impairment meets . . . a listing." *Carlson*, 604 F.3d at 593; *accord Schmitt*, 27 F.4th at 1359.

To satisfy the requirements of Listing 11.14B, Plaintiff's neuropathy "must result in a marked limitation in physical functioning and a marked limitation in one of the four areas of mental functioning."  20 C.F.R. pt. 404, subpt. P, app. 1, § 11.00G2.  Like the ALJ and the parties, the Court assumes for purposes of the instant motions that Plaintiff has a marked limitation in physical functioning.

A marked limitation in mental functioning "means that, due to the signs and symptoms of [a claimant's] neurological disorder, [a claimant is] seriously limited in the ability to function independently, appropriately, effectively, and on a sustained basis in work settings."  *Id.* § 11.00G2b.  "Marked" is not defined "by a specific number of mental activities."  *Id.*  Rather, "the nature and overall degree of interference with [a claimant's] functioning" is considered.  *Id.* § 11.00G2.  A claimant "may have a marked limitation in [his] mental functioning when several activities or functions are impaired, or even when only one is impaired."  *Id.* § 11.00G2b.  A claimant "need not be totally precluded from performing an activity to have a marked limitation, as long as the degree of limitation seriously limits [his] ability to function independently, appropriately, and effectively on a sustained basis, and complete work-related mental activities."  *Id.*

Plaintiff asserts that the ALJ erred by concluding that he had a moderate rather than marked limitation in concentrating, persisting, or maintaining pace.  "This area of mental functioning refers to the abilities to focus attention on work activities and to stay on-task at a sustained rate."  *Id.* § 11.00G3biii.

> Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner;

> ignoring or avoiding distractions while working; changing
> activities or work settings without being disruptive; working
> close to or with others without interrupting or distracting
> them; sustaining an ordinary routine and regular attendance at
> work; and working a full day without needing more than the
> allotted number or length of rest periods during the day.

*Id.* Plaintiff points to the opinions of his psychologist David H. Moll, L.P., and Dr. Hellweg; reports of pain, fatigue, and side effects from medication; and the testimony of the medical expert at his first hearing about the effects of pain and fatigue on mental functioning.

### 1. Medical Records

### a. Psychiatric Care

In mid-November 2015, Plaintiff met with psychiatrist David R. Tverberg, M.D., following hospitalization for uncontrolled diabetes. Tr. 647, 2521; *see generally* Tr. 797-826. Dr. Tverberg noted that Plaintiff was started on Lexapro[5] while in the hospital, had his mirtazapine[6] discontinued, and continued with protriptyline.[7] Tr. 647, 2522. Plaintiff had financial difficulty getting his medication. Tr. 647, 649, 2522, 2524. Dr. Tverberg listed depression as Plaintiff's diagnosis. Tr. 648, 2523. Among other things, Dr. Tverberg noted that Plaintiff was alert and fully oriented and had no memory impairments. Tr. 646, 2521. Dr. Tverberg had no concerns for Plaintiff's attention and concentration. Tr. 646, 2521. Plaintiff had one additional session with Dr. Tverberg in

---

[5] Lexapro is a brand name for escitalopram, a medication used to treat depression and anxiety. *Escitalopram*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a603005.html (last accessed Mar. 6, 2023).

[6] "Mirtazapine is used to treat depression." *Mirtazapine*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a697009.html (last accessed Mar. 6, 2023).

[7] Protriptyline is used to treat depression." *Protriptyline*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a604025.html (last accessed Mar. 6, 2023).

December 2015.  Tr. 650, 2525.  Plaintiff reported feeling a bit better and Dr. Tverberg increased his Lexapro dose.  Tr. 651, 653, 2526, 2528.  Dr. Tverberg continued to note no concerns for Plaintiff's attention and concentration.  Tr. 650, 2525.

Plaintiff continued seeing Dr. Tverberg for medication management roughly once every two or three months between May 2016 and December 2017.  Tr. 655, 2530, 660, 2535, 665, 2540, 671, 2546, 278, 2553, 686, 2561, 694, 2569, 702, 2577, 710, 742, 2585, 750, 2593.  In May 2016, Dr. Tverberg noted that Plaintiff's "anxiety in combination with severe pain from [his] diabetes is incapacitating."  Tr. 658; *accord* Tr. 2533.  Dr. Tverberg also added panic disorder to Plaintiff's diagnoses.  Tr. 657, 2532.  Dr. Tverberg continued to note no concerns with Plaintiff's attention and concentration.  Tr. 655, 2530, 660, 2535, 665, 2540, 671, 2546, 278, 2553, 686, 2561, 694, 2569, 702, 2577, 710, 742, 2585, 750, 2593.  This was true even when Plaintiff reported experiencing anxiety and insomnia, *see, e.g.*, Tr. 655, 2530, 656, 2531, 660, 2535, 661, 2536, 702, 2577, 704, 2579, and when Plaintiff reported increased pain, *see, e.g.*, Tr. 665, 2540, 666, 2541; *see also* Tr. 694, 2569, 696, 2571.

Dr. Tverberg continued to make adjustments to Plaintiff's medications, such as switching him from alprazolam[8] to diazepam[9] and from Lexapro to Cymbalta[10], and

---

[8] "Alprazolam is used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks)."  *Alprazolam*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a684001.html (last accessed Mar. 6, 2023).

[9] Among other things, diazepam is used to treat anxiety and "to control muscle spasms and spasticity caused by certain neurological disorders."  *Diazepam*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682047.html (last accessed Mar. 6, 2023).  Valium is one brand name for diazepam.  *Id.*

[10] Cymbalta is a brand name for duloxetine, a medication "used to treat depression in adults and generalized anxiety disorder" and the "pain and tingling caused by diabetic neuropathy (damage to nerves that can develop in people who have diabetes)."  *Duloxetine*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a604030.html (last accessed Mar. 6, 2023).

increasing his dose of buprenorphine[11].  Tr. 664, 2539, 680, 2555.  In September 2016,

Dr. Tverberg proscribed Percocet[12] to help with pain management.  Tr. 666, 2541, 670,

2545.   At Plaintiff's next visit in October, however, Percocet was discontinued as

Plaintiff appeared to be abusing his opiate medication and was arrested for shoplifting a

pill crusher.   Tr. 673, 2548, 676, 2551.   Although Plaintiff struggled with pain

management in and around April and June 2017, Dr. Tverberg generally noted that

Plaintiff was doing better and his pain was better controlled on Suboxone[13] between

November 2016 and December 2017.  *Compare, e.g.*, Tr. 694, 2569, 696, 2571, 702,

2577, 704, 2579 *with* Tr. 678, 2553, 680, 2555, 684, 2559, 686, 2561, 688, 2563, 692,

2567, 710, 742, 2585, 712, 744, 2587, 750, 2593, 751, 2594.  In December 2017, Plaintiff

reported that he is "definitely doing better compared to one year ago."  Tr. 750, 2593.

In 2018, Plaintiff began seeing Joseph Wilson, M.D., for medication management.

Tr. 2601.  Dr. Wilson noted that Plaintiff experienced "chronic pain with neuropathy,"

but his "mood disorder seem[ed] stable" and he appeared "to be doing well."  Tr. 2605,

2610.  Like Dr. Tverberg, Dr. Wilson noted no concerns with Plaintiff's attention and

concentration.  Tr. 2605, 2610.

---

[11] Buprenorphine is used to treat opioid-use disorder.  *Buprenorphine*, Substance Abuse & Mental Health Servs. Admin., U.S. Dep't of Health & Human Servs., https://www.samhsa.gov/medications-substance-use-disorders/medications-counseling-related-conditions/buprenorphine (last accessed Mar. 6, 2023).  Among other things, buprenorphine can "[d]iminish the effects of physical dependency to opioids, such as withdrawal symptoms and cravings." *Id.*

[12] Percocet is a brand name for a medication containing a combination of oxycodone and acetaminophen. *Oxycodone*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682132.html (last accessed Mar. 6, 2023).

[13] Suboxone is a brand name for "[b]uprenorphine/naloxone sublingual films."  *Buprenorphine*, Substance Abuse & Mental Health Servs. Admin., U.S. Dep't of Health & Human Servs., https://www.samhsa.gov/medications-substance-use-disorders/medications-counseling-related-conditions/buprenorphine (last accessed Mar. 6, 2023).  *See also supra* n.11.

Dr. Wilson saw Plaintiff five times in 2019 and four times in 2020. Tr. 2611, 2773, 2616, 2779, 2622, 2785, 2628, 2791, 2797 (2019); Tr. 2804, 2811, 2818, 2825 (2020). Each time, Dr. Wilson similarly noted no concerns with Plaintiff's attention and concentration. Tr. 2611, 2773, 2616, 2779, 2622, 2785, 2628, 2791, 2797, 2804, 2811, 2818, 2825. In September 2019, Plaintiff reported improvements in his mood and less pain with an increased dose of duloxetine.[14] Tr. 2628, 2791, 2632, 2795. In December 2019, Dr. Wilson noted that Plaintiff "doesn't seem to me disabled from psychiatric perspective." Tr. 2802. While Plaintiff struggled with "rollercoaster" moods, some irritability, and intermittent anger in and around June and September 2020, Plaintiff was generally noted to be doing well. *Compare* Tr. 2811, 2812, 2818, 2819 *with* Tr. 2611, 2773, 2615, 2777, 2628, 2791, 2632, 2795, 2804, 2825, 2826. And, although Plaintiff still continued to have neuropathic pain, the pain was overall better with medication adjustments. *See, e.g.*, Tr. 2809, 2830. In November 2020, Plaintiff reported that he was "[d]oing well," his anger and irritability had improved, and his sleep was "fine." Tr. 2826.

When Plaintiff met with Dr. Wilson in February 2021, his depression was doing better and he had less pain, but reported anxiety associated with the stress of his housing situation and the denial of his disability applications. Tr. 2833, 2838. Dr. Wilson continued to note no concerns with Plaintiff's attention and concentration. Tr. 2833.

---

[14] *See supra* n.10.

### b.  Therapy & Other Mental-Health Treatment

In early December 2015, Plaintiff met with Moll for psychotherapy based on a referral from Dr. Tverberg.  Tr. 641, 2504.  Plaintiff reported feeling "very depressed" but "denie[d] any significant anxiety."  Tr. 641; *accord* Tr. 2504.  Moll noted that Plaintiff was a musician (singing and playing string instruments) and "really enjoys computers, putting them together and taking them apart."  Tr. 641; *accord* Tr. 2504.  Moll observed that Plaintiff was fully oriented.  Tr. 642, 2505.  While Plaintiff's speech and thought processes were described as slow, Plaintiff's judgment and insight were good.  Tr. 642, 643, 2505, 2506.  Moll noted that Plaintiff "seems rather cooperative."  Tr. 643; *accord* Tr. 2506.  Moll likewise diagnosed Plaintiff with depression.  Tr. 644, 2507.  Plaintiff had one additional session with Moll in December, where they "[d]eveloped [a] treatment plan around depressed mood, relationships and anger issues." Tr. 718.

Plaintiff resumed therapy with Moll in April 2016, but then did not return until July due to insurance issues.  Tr. 720, 723.  Plaintiff reported feeling very anxious and Moll added panic disorder to his list of diagnoses.  Tr. 720, 723.  Towards the end of August 2016, Plaintiff experienced a period of decompensation, in which he showed up to Moll's office in an "emotional crisis," feeling suicidal.  Tr. 725; *see also* Tr. 1237-39, 844-52 (treatment sought at emergency room a few days prior for increased anxiety, reported "misplaced his diazepam and hasn't had any for 1 week" and "dropping a bottle of Valium and having to throw them away").  Plaintiff was taken to the emergency room and hospitalized until mid-September.  Tr. 725, 515, 867; *see generally* Tr. 515-40, 867-

875.  It was strongly suspected that Plaintiff had been "misusing his medications and abusing them prior to admission because he went through a large amount that he ran out of [sic]."  Tr. 516; *see also* Tr. 538.  It was recommended that Plaintiff be weaned off opiate medications entirely or prescribed at a "much lower dose."  Tr. 516.

Following his discharge, Plaintiff was admitted to an intensive residential treatment program.  *See generally* Tr. 1410-33.  Plaintiff told Moll he felt better physically and mentally while in the program.  Tr. 727.  Plaintiff was subsequently discharged from the program, however, after being arrested for shoplifting.  Tr. 1430.  Law enforcement "found an oxycontin on him, along with a pill crusher and a straw."  Tr. 1430.

Plaintiff subsequently reported to the emergency room with suicidal ideation at the end of October 2016.  Tr. 876; *see generally* Tr. 876-889.  Plaintiff reported that he was "off all [his] meds, in so much pain and having suicidal thoughts."  Tr. 886.  It was noted that Dr. Tverberg had confronted Plaintiff "with evidence of having abused his meds" the day before.  Tr. 887.  It was also noted that Plaintiff "appears to be malingering and drug seeking" and he was discharged.  Tr. 889.

A few days later, Plaintiff was admitted to the mental-health unit where he remained hospitalized until roughly mid-November due to suicidal ideation and "feeling overwhelmed by his situation."  Tr. 891-92; *compare* Tr. 891 (11/10/16 discharge date) *with* Tr. 563, 893, 2438 (11/14/16 discharge date); *see generally* Tr. 891-927.  During his hospitalization, Plaintiff "participated in individual, group and milieu therapy."  Tr. 892;

*cf.* Tr. 895 (noting minimal participation).   Seroquel[15] was reinitiated, which "help[ed] Plaintiff's] sleep regulate significantly."   Tr. 892.   Plaintiff's Cymbalta and mirtazapine prescriptions were continued.   Tr. 892.   "It was noted that [Plaintiff] was showing signs of opiate withdrawal . . . ."   Tr. 892.   Plaintiff was noted to be a good candidate for buprenorphine and started on Suboxone.   Tr. 892.   Plaintiff tolerated the medication well and reported "that it did reduce pain in his feet significantly and also found that it reduced the craving for opiates."   Tr. 892.   Plaintiff "tended to isolate" and had periods of time where "he was irritable or irritated with staff and peers."   Tr. 892.   It was noted that Plaintiff "did tend to isolate so that he would not get angry with others."   Tr. 892.

Plaintiff met with Moll six times between December 2016 and November 2017. Tr. 729, 732, 735, 738, 637, 2502, 740, 758.   In April 2017, Plaintiff asked Moll to "clear him of mood difficulties so that his physician . . . [would be] comfortable prescribing Percocet for nerve pain."   Tr. 735; *cf.* Tr. 582.   Moll noted the prior concerns over Plaintiff misusing his medication.   Tr. 735.   With the exception of September 2017, Moll noted that Plaintiff's mood and functioning had improved and his progress was between fair and good.   Tr. 729, 732, 735, 740, 758.   In September 2017, Plaintiff reported "a high degree of depressive symptoms."   Tr. 637, 2502.   Plaintiff's "physical pain ha[d] gotten worse in that the neuropathy [wa]s getting to be more intense and frequent."   Tr. 637, 2502.   At the same time, Plaintiff took daily walks, spent more time with his daughter, and was "[e]ducating [him]self on computer programming and other topics to occupy his

---

[15] Seroquel is a brand name for quetiapine, a medication use to treat depression, among other things. *Quetiapine*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a698019.html (last accessed Mar. 6, 2023).

time." Tr. 637, 2500. Moll continued to work on relationships with Plaintiff, including coparenting. Tr. 732, 740, 758.

Towards the end of January 2019, Moll conducted a diagnostic interview of Plaintiff following a referral to determine eligibility for mental-health services. Tr. 2512, 2765. Plaintiff reported that he was "hanging in there." Tr. 2512; *accord* Tr. 2765. Plaintiff reported "experienc[ing] anxiety as well as . . . a depressed mood" along with "some edginess between doses of S[u]boxone." Tr. 2512; *accord* Tr. 2765. Moll noted that this "may be more of an anxiety issue rather than a dependency or withdraw[al] issue[]." Tr. 2512; *accord* Tr. 2765. Plaintiff reported "spend[ing] most of his time watching movies, playing videogames, and supporting a friend when he is available." Tr. 2512; *accord* Tr. 2765. Plaintiff also "had some opportunities to help others with computer designs" and was considering "joining a church group." Tr. 2512; *accord* Tr. 765; *see also* Tr. 2514 ("He is thinking about joining the church band."), Tr. 2765 (same).

During the assessment, Plaintiff reported no concerns with attention and concentration. Tr. 2513, 2766. Plaintiff did report difficulty staying asleep and relaxing as well as excessive worrying and panic symptoms. Tr. 2513, 2766. Moll noted that Plaintiff was fully oriented and had normal speech and thought processes. Tr. 2515, 2768. Moll additionally noted that Plaintiff was cooperative and his judgment and insight were fair. Tr. 2516, 2769. In his summary, Moll noted that Plaintiff "has had significant difficulty functioning to the extent that he has had poor follow[-]up care for his mental health and serious physical health problems." Tr. 2517; *accord* Tr. 2770. Moll added

rule out avoidant personality disorder and a provisional diagnosis of social anxiety disorder to Plaintiff's diagnoses.  Tr. 2517, 2770.

Plaintiff met with Moll on a nearly monthly basis between July and December 2019.  Tr. 2634, 2840, 2637, 2843, 2640, 2846, 2643, 2849, 2646, 2852, 2649, 2855, 2652, 2858, 261.  Moll noted that Plaintiff "seem[ed] like he is more invested at this time."  Tr. 2634, 2840.  Over the course of these visits, Moll noted stabilization in Plaintiff's mood and improved functioning.  Tr. 2637, 2843, 2640, 2846, 2643, 2849, 2652, 2858, 2861; *see* Tr. 2646, 2852 (good progress), Tr. 2649, 2855 (fairly good progress); *see also* Tr. 2725 (note from another service provider that Plaintiff's mental health "is stable right now").  While Plaintiff was nervous at the beginning of December about his upcoming disability hearing, he was still "[d]oing fairly well in interpersonal function" and his "mood and avoidant behavior [sic] are stable."  Tr. 2652, 2858.  Similarly, although anxiety was "still an issue" for Plaintiff at the end of December, Moll noted that he was "[f]unctioning rather well given few stressors."  Tr. 2861.

Plaintiff continued to meet with Moll once per month between January and March 2020.  Tr. 2864, 2867, 2870.  Plaintiff and Moll continued to work on his anxiety, and Moll continued to note that Plaintiff's mood and functioning were improving.  Tr. 2870; *see* Tr. 2864 (good progress); *see also* Tr. 2762 (panic attacks less severe in July 2020), 2747 (infrequent panic attacks reported in August 2020), 2922 (Plaintiff describes "mood as improving" in October 2020).

2.  **Opinion Evidence**

a.  **Moll**

Moll completed a mental-impairment questionnaire for Plaintiff.  *See generally* Tr. 2655-2660.   In relevant part, Moll wrote that Plaintiff had a "moderate response" to treatment "in that he has established some social support and improved leisure life."  Tr. 2655.  Moll additionally wrote that Plaintiff "continues to be significantly depressed and . . . experiences anxiety that inhibits engagement in the community."  Tr. 2655.  Moll opined that Plaintiff had extreme limitation in his ability to maintain concentration, persistence, or pace, which was "[b]ased on behavioral observations and the extensive history of care established."[16]  Tr. 2656.

Moll additionally opined that Plaintiff's abilities to understand, remember, and carry out very short and simple instructions; make simple work-related decisions; and ask simple questions and request assistance were unlimited or very good.   Tr. 2658. Plaintiff's abilities to understand, remember, and carry out detailed instructions; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers and peers were limited but satisfactory.  Tr. 2658, 2659.  Plaintiff's abilities to maintain attention for a two-hour segment; work in close proximity to others without being unduly distracted; and perform at a consistent pace without an unreasonable number and length would not meet competitive standards.  Tr. 2658.  Moll explained that "[d]espite some attempts at employment, even jobs that [Plaintiff] is overqualified for, he has not been able to last for more than a few days due to the stress," resulting in Plaintiff

---

[16] Moll's handwriting is difficult to read here.

becoming panicked, severely depressed, and overwhelmed.[17]  Tr. 2658.  Moll noted that Plaintiff's "[d]iabetic[-]related pain [was] likely to exacerbate [his] emotional dysfunction."  Tr. 2659.

### b.  Dr. Hellweg

Dr. Hellweg provided three similar opinions.  *See generally* Tr. 2661-69, 2945-54. In relevant part, Dr. Hellweg noted that Plaintiff had a history of diabetic peripheral neuropathy affecting his upper and lower extremities.  Tr. 2661, 2951; *see* Tr. 2950.  Dr. Hellweg rated Plaintiff's pain as moderate to severe, and described it as "shooting pain in feet."  Tr. 2666, 2951.  Plaintiff also experienced sleep disturbance and chronic fatigue as well as drowsiness as a side effect of his medication.  Tr. 2666-67, 2952.

Dr. Hellweg opined that Plaintiff's pain and other symptoms would constantly interfere with his abilities to maintain attention and concentration, noting that Plaintiff "is constantly distracted by pain."  Tr. 2668-69; *see* Tr. 2952-54.  Dr. Hellweg further explained that "[t]he effects of [Plaintiff's] polyneuropathy are evidenced by significant limitations in sensation in the bilateral feet resulting in severe pain which is a constant distractor in his ability to adequately perform job functions for any prolonged period of time."  Tr. 2950.  Dr. Hellweg opined that Plaintiff was not capable "of even 'low stress' jobs."  Tr. 2669; *accord* Tr. 2954; *see* Tr. 2950.

### c.  Medical Expert

At Plaintiff's first hearing, the ALJ took testimony from a medical expert.  *See generally* Tr. 72-89.  The medical expert testified that he considered whether Plaintiff's

---

[17] *See supra* n.16.

neuropathy met Listing "11.14" when reaching the conclusion that Plaintiff's impairments did not meet or equal a listed impairment.  Tr. 75.

On cross examination, the medical expert agreed that Plaintiff's neuropathy "comes with pain."  Tr. 79.  The medical expert testified that the pain can be constant and can become worse with "prolonged use of the [affected] extremity."  Tr. 79.  When asked whether pain "would create a marked limitation in terms of mental functioning," the medical expert responded:

> It's really hard to quantify, you know, how much pain would, you know equate to this amount of decreased of [sic] mental functioning.  What I can say is that, yes, if there is some—if somebody is in pain it would definitely impact their ability to concentrate and maintain, you know, mental functioning. How much?  I don't think anyone knows.

Tr. 79-80.  The medical expert also testified that pain could interfere with a person's sleep to the point of waking a person up, and therefore could result in fatigue, "which could also interfere with one's thinking."  Tr. 80.  The medical expert additionally testified that, based on the

> subjective and objective findings throughout the record,[18] it appears that [Plaintiff is] able to follow instructions and [Plaintiff is] able to—he does not meet the listing where it's like extreme or marked about [sic] of deficiency due to pain and fatigue.  So, I'm not denying that there's that symptom. I'm just simply stating that it does not meet or equal to the point where it's markedly severe.

Tr. 82.

---

[18] Again, the first hearing took place in December 2019, so the medical expert's review was based on records predating that hearing.

### 3. Finding of Moderate Limitation

The ALJ found that Plaintiff had moderate limitation in concentrating, persisting, or maintaining pace.  The ALJ cited Plaintiff's "reports [of] significant difficulty with concentration and completing tasks."  Tr. 25; *see also* Tr. 25 ("He states he does not finish what he starts."); *see, e.g.*, Tr. 62, 95, 100, 102-03, 427, 432.

The ALJ acknowledged that Plaintiff "also suffers from some chronic pain related to diabetic neuropathy, which is likely to affect his ability to concentrate, persist, and maintain pace."  Tr. 25.  The ALJ noted, however, that Plaintiff "has consistently been noted to have normal thought processes and normal concentration and attention on mental status examinations"; "specifically denied difficulties with concentration and attention"; and "does not endorse any ongoing difficulties with concentration and task completion at appointments with his mental health providers."  Tr. 25.  The ALJ additionally noted that Plaintiff "regularly engages in tasks such as watching television and movies, working on computers, learning about computers, maintaining his church's website, playing a musical instrument, driving, and playing videogames, all of which require some degree of persisten[ce] and concentration."  Tr. 25.  Accordingly, the ALJ found that Plaintiff "has a moderate limitation in concentrating, persisting, or maintaining pace."  Tr. 25.

### 4. No Error at Step Three

The ALJ's determination that Plaintiff was not seriously limited in his abilities to concentrate, persist, and maintain pace and thus not did not have a marked limitation in this area of mental functioning is supported by substantial evidence in the record as a whole.  As the ALJ correctly pointed out, Plaintiff's mental-health providers consistently

and repeatedly noted no concerns in Plaintiff's abilities to maintain attention and concentration, even when he was experiencing increased pain and mental-health symptoms. *See Twyford*, 929 F.3d at 517. The ALJ also pointed to evidence in the record demonstrating that Plaintiff regularly engaged in activities that "require[d] some degree of persisten[ce] and concentration," including "watching television and movies, working on computers, learning about computers, maintaining his church's website, playing a musical instrument, driving, and playing videogames." Tr. 25; *see* Tr. 31 (discussing activities of daily living, including living in his own apartment, caring for five-year-old daughter, driving, working on computers, involvement at church, cooking, cleaning, using public transportation, and shopping in stores); *see also* Tr. 58 (driving), 431 (listing "Computers, TV, Movies, Music, Games, Website building" as hobbies and interests), 2921 ("works at church- 20-30 hours weekly (volunteer)"). *See Schmitt*, 27 F.4th at 1359-60; *Twyford*, 929 F.3d at 517. The record further reflects that Plaintiff prepares his own meals and cares for his young daughter. Tr. 428-29; *see* Tr. 38 (noting that Plaintiff "has generally intact activities of daily living, and is primarily responsible for caring for a 5 year old").

Moreover, the ALJ determined Moll and Dr. Hellweg's opinions regarding Plaintiff being extremely limited in his abilities to concentrate, persist, and maintain pace were not persuasive, which Plaintiff has not challenged. *See* 20 C.F.R. §§ 404.1520c, 419.920c (evaluating persuasiveness of medical opinions).[19] The ALJ noted that Moll's

_____

[19] Plaintiff's applications were filed in September 2017. *See, e.g.*, Tr. 174, 141, 142. Accordingly, the evaluation of opinion evidence is governed by the criteria set forth in 20 C.F.R. § 404.1520c and § 416.920c. *See Austin*, 52 F.4th

opinion was "not well supported," explaining that the record reflected that Plaintiff "lost his last two jobs for misconduct not for impairment related reasons."  Tr. 38; *see* Tr. 84-86 (discussing termination from prior positions with fast-food establishment and retailer); *see also, e.g.*, Tr. 824.  *See* 20 C.F.R. §§ 404.1520c(b)(2) (supportability one of most important factors in determining persuasiveness of medical opinion), (c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."), 416.920c(b)(2), (c)(1) (same).  The ALJ also noted that this extreme limitation was "not supported by mental status examinations showing compromised concentration or thought processes," and "[i]n fact, [Plaintiff's] mental status examinations have shown intact thoughts, attention, and concentration on a consistent basis."  Tr. 38.  *See* 20 C.F.R. §§ 404.1520c(b)(2) (consistency one of most important factors in determining persuasiveness of medical opinion), (c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."), 416.920c(b)(2), (c)(2) (same).  The ALJ similarly pointed out Plaintiff's "reports of stable mental health and improving functionality, and . . . Moll's own observations of improvement in functioning since [Plaintiff's] sobriety from opiates."  Tr. 38.

---

at 728 & n.2 (noting "recently revised regulations" "apply to all claims filed on or after March 27, 2017); *cf.* 20 C.F.R. §§ 404.1527, 416.927 (evaluating opinion evidence for claims filed before March 27, 2017).

The ALJ likewise found Dr. Hellweg's opinions "regarding [Plaintiff's] inability to pay attention" to be inconsistent with the record, again focusing on mental status examinations showing Plaintiff had intact attention and concentration.  Tr. 37.  *See* 20 C.F.R. §§ 404.1520c(b)(2), (c)(2), 416.920c(b)(2), (c)(2).  The ALJ also took into account that Dr. Hellweg's opinions regarding Plaintiff's abilities to maintain attention and concentration were outside his area of expertise when evaluating the persuasiveness of this opinion.  Tr. 37 ("Notably, Dr. Hellweg is not [Plaintiff's] mental health treatment provider.").  *See* 20 C.F.R. §§ 404.1520c(c)(4) ("The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty."), 416.920c(c)(4) (same).

In sum, substantial evidence in the record as a whole supports the ALJ's determination that Plaintiff's neuropathy did not meet Listing 11.14B at step three.

**B.  Step Four: Residual Functional Capacity**

Plaintiff next asserts that the ALJ erred at step four when determining his residual functional capacity by not including the standing, walking, and absenteeism limitations identified by Dr. Hellweg.

A claimant's "residual functional capacity is the most [he] can do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1) (same); *see McCoy*, 648 F.3d at 614 ("A claimant's [residual functional capacity] represents the most he can do despite

the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt*, 27 F.4th at 1360. "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records." *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. §§ 404.1546(c), 416.946(c). "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations." *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *Norper*, 964 F.3d at 744-45. As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 27 F.4th at 1360 (quotation omitted). Nor is an ALJ "limited to considering medical evidence exclusively." *Id.* (quotation omitted). Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F.4th at 1360; *see* 20 C.F.R. §§ 404.1546(c), 416.946(c). Plaintiff bears the burden to establish his residual functional capacity. *Mabry v. Colvin*, 815 F.3d 386, 390 (8th Cir. 2016).

Plaintiff asserts that the standing and walking limitations are supported by repeat foot and leg examinations showing a lack of sensation in his lower extremities, calluses on his feet, and his reports of pain.[20]  Plaintiff additionally asserts that the absenteeism limitation is supported by his reports of pain, nausea, and fatigue; his mental impairments; and Moll's opinion indicating a similar rate of absenteeism.

### 1.  Medical Records

Plaintiff was diagnosed with type 1 diabetes when he was a teenager and has a history of diabetic neuropathy.  *See, e.g.*, Tr. 490, 567, 633, 628, 766-82, 2407, 2394-97, 2381, 2383, 2377, 2372, 2370, 2364, 2357, 2353-54, 2343-52.  *See also supra* Section IV.A.1.  As noted above, at certain points in time, Plaintiff's treatment providers have expressed concern over his use of opiate mediations.  *See, e.g.*, Tr. 604 (October 2015 emergency room notes regarding requests for stronger pain medications); Tr. 2423, 2425 (April 2016 notes indicating Plaintiff "was on extraordinarily high narcotic pain meds and had a difficult-to-believe story about having lost his prescription"); Tr. 500-01, 2431 (May 2016 emergency room notes stating Plaintiff "is on high doses of narcotics," "had issues where his medications got lost or damaged (by moisture) and has went to ED for opiate prescriptions," and received "pain medications from at least 4 different ED providers" in the last year); Tr. 853-59 (August 2016 emergency room note that Plaintiff

---

[20] To the extent Plaintiff also claims that Dr. Hellweg's standing and walking limitations are "supported by sores . . . present on [his] feet," Pl.'s Mem. in Supp. at 43 (citing Tr. 1015, 2314, 2325, 2927), Plaintiff has not cited to any evidence in the record documenting such sores.  The majority of the citations provided by Plaintiff refer to the observed areas of callus formation.  *See, e.g.*, Tr. 2314, 2325, 2927.  The citation to Tr. 1015 is a medical record for treatment of "cutaneous abscesses of [Plaintiff's] right *armpit*."  Tr. 1015 (emphasis added); *see also* Tr. 1015 (referring to "right axilla").  It is not apparent to this Court how sores in Plaintiff's armpit support the standing and walking limitations opined by Dr. Hellweg.  Moreover, notes from examinations of Plaintiff's feet reflect that there was no sign of "evolving ulcerations."  Tr. 2324-25, 2927.

"lost his prescription for oxycodone" but also "tested positive for oxycodone," diagnosed with opioid dependence withdrawal).  Plaintiff also has a history of nausea.  *See, e.g.*, Tr. 628, 600, 2372.

### a. 2015

At the end of October 2015, Plaintiff was seen in follow-up to an emergency room visit.  Tr. 597, 2414; *see* Tr. 783-96, 2410.  Plaintiff's primary complaint was pain in his legs and feet.  Tr. 597, 2414.  Plaintiff reported "some immediate relief from . . . Percocet" but Vicodin[21] provided longer relief.  Tr. 597; *accord* Tr. 2414.  Upon examination, Plaintiff's feet "appear[ed] normal" with no pedal edema.  Tr. 598; *accord* Tr. 2415.  Plaintiff had "[d]ecreased joint position sense" and "vibratory sense" as well as "[a]bsent monofilament."[22]  Tr. 598; *accord* Tr. 2415.  Similar observations were made during a follow-up appointment approximately one month later.  Tr. 595-96, 2417.  It was also noted that Plaintiff "really does not feel as [sic] pain management is doing all that well."  Tr. 595; *accord* Tr. 2416.  Plaintiff denied having nausea or vomiting and was noted to be "tolerating his present medications."  Tr. 595; *accord* Tr. 2416.  Plaintiff's hydrocodone/acetaminophen and Neurontin[23] prescriptions were continued and he was

---

[21] Vicodin is a brand name for a medication containing a combination of hydrocodone and acetaminophen. *Hydrocodone and acetaminophen overdose*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/ency/article/002670.html (last accessed Mar. 6, 2023).

[22] "A monofilament test is done to test for nerve damage (peripheral neuropathy), which may be caused by conditions such as diabetes.  The monofilament is a small strand of nylon attached to a plastic base.  The provider uses this monofilament to check for loss of feeling on . . . [the patient's] foot."  *Monofilament Test*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/ency/imagepages/19960.htm (last accessed Mar. 6, 2023); *see also* Podiatry Malpractice Litig. § 27, 85 Am. Jur. Trials 189 ("In this test, a single filament is pressed against the skin until it just begins to bend.  If a sense of pressure is not felt with a filament of size 6.10, then there is significant sensory impairment.  This test is particularly useful in the detection of diabetic neuropathy.").

[23] Neurontin is a brand name for gabapentin, a medication used to treat, among other things, "the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles)."  *Gabapentin*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a694007.

additionally prescribed oxycodone/acetaminophen.  Tr. 595, 2416.  Plaintiff was further instructed to use Tramadol[24] as needed.  Tr. 595, 2416.

Discharge notes from a three-day hospitalization for abdominal pain in November 2015 state that Plaintiff's diabetic neuropathy "has led to pain in his lower extremities, back and hands."  Tr. 797; *accord* Tr. 815; *see generally* Tr. 797-826.  Plaintiff reported that "he was weak and fell before and has had difficulty with balance due to neuropathy in the past."  Tr. 797; *accord* Tr. 815.  Plaintiff additionally reported that "he gets a numbing/tingling sensation in [his] lower extremities if he stands for too long"  Tr. 797; *accord* Tr. 815.  During this stay, diminished sensation was noted in Plaintiff's lower extremities.  Tr. 817.

### b.  2016

In early May 2016, Plaintiff went to the emergency room with complaints of weakness.  Tr. 834.  Plaintiff reported "that he woke up in the middle of the night and vomited" and was "feeling weak and dizzy" in the morning, which worsened when standing.  Tr. 834; *accord* Tr. 839.  Plaintiff reported that his legs felt "weaker than normal," he was "experiencing pain in his legs," and he "ha[d] been unable to stand up."  Tr. 834; *accord* Tr. 839.  Among other things, Plaintiff also reported experiencing fatigue, vomiting, nausea, tingling, and numbness.  Tr. 834, 839.  Plaintiff's symptoms

---

html (last accessed Mar. 20, 2023).
[24] "Tramadol is used to relieve moderate to moderately severe pain."  *Tramadol*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a695011.html (last accessed Mar. 20, 2023).

were thought to be at least partially attributable to a reaction to starting clonazepam[25] a few days earlier and he was directed to stop taking this medication.  Tr. 840-42  At an appointment approximately ten days later, Plaintiff's feet again appeared normal with joint position sense and monofilament testing continuing to be noted as abnormal.  Tr. 591, 2426-27.  Plaintiff's Neurontin prescription was continued and his doses of oxycodone and OxyContin were to be slowly tapered.  Tr. 590, 2426.

During an emergency room visit at the end of May for back pain, Plaintiff denied experiencing vomiting or nausea.  Tr. 500, 2430.  It was noted that Plaintiff "does have ongoing worsening of his chronic neuropathy but otherwise no new numbness in the lower extremities."  Tr. 2431.  Plaintiff had full strength in his lower extremities.  Tr. 500, 2431.  Concerns were expressed over Plaintiff's "high dose of narcotics."  Tr. 2431; *accord* Tr. 500-01.

During a follow-up examination in November 2016, Plaintiff was noted to "have decreased sensation bilaterally on the dorsal and ventral sides of the feed."  Tr. 564; *accord* Tr. 2439.  Plaintiff did "exhibit some sensation to pinprick on the underside of the phalanges."  Tr. 564; *accord* Tr. 2439.

### c.  2017

In March 2017, Plaintiff reported "experiencing a lot of bilateral leg pain" and wanted "to discuss reinitiating narcotics to control the pain."  Tr. 582; *accord* Tr. 2448. Upon examination, Plaintiff had "[n]ormal leg strength bilaterally" with "[n]o focal

---

[25] Clonazepam is used to treat panic attacks, among other things.  *Clonazepam*, MedlinePlus, U.S. Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682279.html (last accessed Mar. 6, 2023).

limitations or problems," "cyanosis, clubbing, or edema."   Tr. 583; *accord* Tr. 2449.
Plaintiff was noted to have decreased sensation in his lower legs.   Tr. 583, 2449.
Plaintiff's treatment provider wanted to consult with Plaintiff's mental-health provider
before reinitiating narcotics.   Tr. 583, 2449; *see* Tr. 735 (requesting Moll "clear" him").

In early May, Plaintiff was hospitalized overnight with complaints of nausea and
vomiting, among other things.   Tr. 933; *see generally* Tr. 928-46.   The discharge notes
stated that Plaintiff's polyneuropathy is "quite severe" and "a number of other
medications have been tried."   Tr. 929.   Plaintiff was hospitalized again for a few days at
the end of May for vomiting and abdominal pain, among other things.   Tr. 948; *see* Tr.
962 (directed to emergency room by nurse line); *see generally* Tr. 948-967.   Plaintiff
"report[ed] feeling persisting nausea."   Tr. 958

Plaintiff was next seen in early June in follow-up to his recent emergency-room
visit and hospitalization.   Tr. 574, 2461.   Plaintiff continued to experience nausea in the
morning and stated that his current dose of oxycodone was "not strong enough to control
his pain."   Tr. 574; *accord* Tr. 2461.   Examination of Plaintiff's extremities showed full
range of motion in his upper and lower extremities with "[n]o focal limitations or
problems," "cyanosis, clubbing, or edema."   Tr. 575; *accord* Tr. 2462.   Plaintiff's
oxycodone prescription was refilled along with his ondansetron[26] prescription for nausea.
Tr. 575, 2462.

---

[26] Ondansetron is a medication "used to prevent nausea and vomiting."  *Ondansetron*, MedlinePlus, U.S. Nat'l Lib.
of Med., https://medlineplus.gov/druginfo/meds/a601209.html (last accessed Mar. 6, 2023).

### d. 2018

At the end of January 2018, Plaintiff met with Dr. Hellweg to establish care and discuss treatment for his diabetes. Tr. 1007, 2329; *see also* Tr. 2950, 2951, 2666. Plaintiff reported that he had run out of insulin for the last two to three weeks. Tr. 1008, 2329. Plaintiff reported no nausea or vomiting. Tr. 1008, 2330. Dr. Hellweg noted that Plaintiff had "a history of known diabetic complications in the lower extremities." Tr. 1008; *accord* Tr. 2329. Dr. Hellweg also noted that Plaintiff had "[n]o lower extremity edema." Tr. 1008; *accord* Tr. 2330.

Plaintiff followed up with Dr. Hellweg in mid-March. Tr. 2324. Dr. Hellweg examined Plaintiff's lower extremities. Tr. 2324-25. Dr. Hellweg noted that there was no edema, but Plaintiff had "[a]bsent sensation to monofilament testing." Tr. 2324; *accord* Tr. 2325. Additionally, while Plaintiff's examination was "without signs of evolving ulcerations," there were, however, "multiple areas of callus formation," along with "normal dorsalis pedal pulses, normal coloration/[c]apillary refill, [and] mildly dystrophic nails bilaterally." Tr. 2324-25. Dr. Hellweg noted that he might consider a podiatry consultation in the future. Tr. 2325.

Approximately six months later, in mid-September, Plaintiff saw Dr. Hellweg again. Tr. 2313. Plaintiff continued to struggle with management of his diabetes. Tr. 2313. Dr. Hellweg noted there had also been some insurance issues. Tr. 2313. Dr. Hellweg's findings upon examination were the same as they had been in March. *Compare* Tr. 2324-25 *with* Tr. 2314.

31

### e.  2019

Plaintiff next met with Dr. Hellweg approximately one year later, in September 2019.  Tr. 2308 ("Notably he has not been seen by this provider in over 1 year and is not routinely following with any other diabetes [e]ducation providers or physicians.  He knows that he has been noncompliant with monitoring of his diabetes and follow-up appointments.").  Upon examination, Plaintiff had "[t]race lower extremity edema" and improvement in his nails ("normal nails without significant dystrophy").  Tr. 2310.  The examination findings were otherwise unchanged from prior exams.  *Compare* Tr. 2324-25, 2314 *with* Tr. 2310.

Plaintiff followed up with Dr. Hellweg roughly one month later.  Tr. 2304, 2942.  Plaintiff continued to have poorly controlled diabetes along with "significant hyperglycemia secondary to noncompliance."  Tr. 2305; *accord* Tr. 2943.  Dr. Hellweg noted that Plaintiff was using multiple glucose meters and not using his insulin pump consistently, including "go[ing] for entire days at a time with his pump in suspended mode."  Tr. 2305; *accord* Tr. 2942.  While Plaintiff had questions about a rash on his thumb, Dr. Hellweg noted that there was no "progression to the palms of the hands or soles of [his] feet."  Tr. 2305; *accord* Tr. 2943.

In mid-December, Plaintiff presented to Dr. Hellweg "for functional evaluation due to difficulties with diabetic neuropathy" in connection with his disability applications.  Tr. 2940; *see generally* Tr. 2661-69.  Outside of Plaintiff's blood pressure, temperature, and weight, the only additional findings from the examination were: "Well-

nourished, well-developed 28 y.o. in no apparent distress.   Awake, alert, age appropriate." Tr. 2941.

Dr. Hellweg noted as follows:

> He describes difficulty with pain distracting him consistently throughout the day despite aggressive neuropathic pain medication regimen including mirtazapine[]and duloxetine. Previous attempts at gabapentin did not result in any significant improvement in his pain.   Further compounding this is a history of uncontrolled type 1 diabetes along with major depressive disorder and opioid use disorder.   He states . . . [he] bec[a]me addicted to opioids a number of years ago after trying to treat his neuropathic pain.   He is now off of opiates but is maintained on a Suboxone program to keep him functional.   Given his difficulties with pain and numbness he is unable to perform prolonged fine motor movement of the upper extremities and hands.   Additionally he is unable to stand for any significant period of time.   He often becomes significantly distracted due to pain and discomfort urinary [sic] it [sic] difficult for him to even perform low-impact work for any significant period of time.

Tr. 2940.   Dr. Hellweg stated that, in his opinion, Plaintiff "does suffer from debilitating pain and disability to such an extent that he is effectively disabled" and completed paperwork in support of Plaintiff's applications.   Tr. 2941; *see generally* Tr. 2661-69. *See also supra* Section IV.A.2.b and *infra* Section IV.B.2.a.

### f.   2020

Plaintiff met with Dr. Hellweg again around the middle of August 2020.   Tr. 2926. Dr. Hellweg noted that Plaintiff was making "significant strides" in controlling his diabetes with the use of a new continuous glucose monitor and regular use of his insulin infusion pump.   Tr. 2926, 2928.   Dr. Hellweg noted that Plaintiff was "already noticing some of the health benefits of this including reducing symptoms of nausea and

33

gastroparesis, mild improvement in sensation in the feet, and possibly even some changes in his vision." Tr. 2928. Upon examination, Plaintiff had no edema in his lower extremities, his nails were mildly dystrophic bilaterally, and he had "absent sensation to monofilament testing bilaterally to the level of the mid shin." Tr. 2927. Plaintiff's examination was otherwise "without signs [of] evolving ulcerations" but continued to reflect "multiple areas of callus formation," "normal dorsalis pedis pulses," and "normal coloration/[c]apillary refill." Tr. 2927.

At the beginning of October, Plaintiff had a consultation with endocrinology. Tr. 2921. In relevant part, it was noted that Plaintiff "has not noted any signs of erythema or ulceration," but does have neuropathy and numbness, which "has been going on for several years." Tr. 2921-22. Plaintiff was encouraged to "work on increasing physical activity," "with a goal of 30 minutes of moderate intensity activity most days per week." Tr. 2924-25.

Plaintiff met with endocrinology again approximately six weeks later. Tr. 2891. Plaintiff reported "less shooting pains" with his neuropathy but "continue[d] to have burning." Tr. 2982; *see* Tr. 2893. Plaintiff also reported experiencing fatigue, nausea, vomiting, and "a loss of balance or tendency to fall easily." Tr. 2893. Upon examination, Plaintiff's feet had normal range of motion. Tr. 2894. Dry skin was also present on both feet, but there was "[n]o skin breakdown." Tr. 2984. Plaintiff's great toes were discolored bilaterally and fungal disease was present. Tr. 2894. There was also a "small abrasion on [the] dorsal surface" of Plaintiff's third right toe. Tr. 2894. Protective sensation testing was performed at five different sites on each foot. Tr. 2894.

34

Of the sites tested, "4 sites sensed" on Plaintiff's right foot whereas "1 site sensed" on Plaintiff's left foot.  Tr. 2894.

Plaintiff was scheduled to meet with Dr. Hellweg two days later.  Tr. 2890.  In light of the fact that Plaintiff "was seen by endocrinology just 2 days ago and actually has no other acute questions or concerns," Plaintiff was advised that he could cancel the appointment with Dr. Hellweg and follow up "in approximately 6 months with routine monitoring labs and an appointment."  Tr. 2890.

### 2.  Opinion Evidence

#### a.  Dr. Hellweg

As stated above, *see supra* Section IV.A.2.b, Dr. Hellweg provided three similar opinions.  *See generally* Tr. 2661-69, 2945-54; *see also* Tr. 2940-41.  In relevant part, Dr. Hellweg noted that Plaintiff had a history of diabetic peripheral neuropathy affecting his upper and lower extremities.  Tr. 2661, 2951; *see* Tr. 2950.  Dr. Hellweg rated Plaintiff's pain as moderate to severe, and described it as "shooting pain in feet."  Tr. 2666, 2951. Plaintiff also experienced sleep disturbance and chronic fatigue as well as drowsiness as a side effect of his medication.  Tr. 2666-67, 2952.

As relevant to the assignments of error, in December 2019, Dr. Hellweg checked boxes indicating that Plaintiff could sit and stand/walk for less than two hours in an eight-hour day.  Tr. 2667; *see* Tr. 2940.  Dr. Hellweg opined that Plaintiff did not need to include periods of walking, but did require the ability to shift positions at will.  Tr. 2667. When asked if Plaintiff's legs needed to be elevated with prolonged sitting, Dr. Hellweg

checked "no."  Tr. 2667.  Dr. Hellweg opined that Plaintiff was likely to be absent more than four days per month as a result of his impairments or treatment.  Tr. 2669.

Dr. Hellweg gave a similar opinion in March 2021.  *Compare* Tr. 2661-69 *with* Tr. 2951-54.  In addition to the limitations previously noted, Dr. Hellweg further opined that Plaintiff needed to walk for five minutes every 30 minutes.  Tr. 2952.  Dr. Hellweg also opined that Plaintiff needed to elevate his legs "to the level of the heart or higher" when engaged in prolonged sitting for 50% of the time to address edema and pain.  Tr. 2952-53.  In an accompanying letter, Dr. Hellweg wrote that Plaintiff's

> abilities to ambulate and stand for prolonged periods are inhibited due to his neuropathy and have resulted in falls and injuries in the past.  Evidence of this impairment are [sic] seen in his physical examination including diminished balance, and proprioception while performing Romberg testing, diminished reflexes, [and] diminished pinprick sensation in lower extremities.

Tr. 2950.

### b.  Medical Expert

As stated above, *see supra* Section IV.A.2.c, the ALJ took testimony from a medical expert at Plaintiff's first hearing.  *See generally* Tr. 72-89.  In relevant part, the medical expert testified that Plaintiff would be able to sit for six hours and stand and walk for "one hour each total in an eight-hour workday."  Tr. 75.  On cross examination, the medical expert testified that he placed restrictions on standing and walking to account for Plaintiff's pain.  Tr. 79.  Commenting on the evidence in the record, the medical expert testified that "[t]he only abnormality in his physical examination that is consistent with this record is a decreased sensation in a bilateral lower leg."  Tr. 81.

### 3.  Capable of a Limited Range of Sedentary Work

The ALJ found that Plaintiff was limited to sedentary work, with the additional relevant limitations that he "could sit for about six hours of eight and could stand and walk for about one hour [each] out of an eight-hour workday."  Tr. 26; *see* Tr. 28. Standing and walking were limited to "30-minute intervals."  Tr. 26.

The ALJ explained that Plaintiff was "consistently noted to have a loss of sensation in his feet due to peripheral neuropathy for poorly controlled diabetes mellitus, which limit[ed his] ability to stand and walk for prolonged periods" and that "[t]his has been accommodated with a limitation to only one hour of standing and one hour of walking, at 30-minute intervals, during the relevant time period."  Tr. 28; *see* Tr. 31 ("Overall, based on [Plaintiff's] long-term loss of sensation to his feet and occasional reports of numbness and pain in his lower extremities and hands, I have found [Plaintiff] to be limited concerning standing and walking . . . .").  The ALJ observed that "[t]he record does not show any loss of strength or range of motion in [Plaintiff's] lower extremities" and "[h]e has been consistently noted to have a normal gait."  Tr. 28.  The ALJ noted that Plaintiff also "had some noncompliance issues and has not always been consistent in his treatment regimens," and had "not made significant reports of pain to his treatment providers, which is inconsistent with the level of functional limitations and pain he alleges."  Tr. 28; *see* Tr. 31 ("consistently intact gait, strength, and range of motion in [Plaintiff's] lower extremities, the lack of reports of significant pain at appointments with providers, the minimal observation or reports of edema . . . , the historical lack of compliance with treatment regimens, and [Plaintiff's] reported recent improvement with

37

ongoing compliance" did not support further limitation).   Additionally, Plaintiff "maintains fair activities of daily living."  Tr. 28.  Plaintiff "lives on his own in an apartment and cares for his five-year old daughter"; "is able to drive"; "has a strong interest in computers[,] . . . continues to keep up with technology news"; "does work on taking apart and putting computers together"; "is involved with his church," "attends weekly services," "sometimes play[s] bass at church on Sunday," "occasionally attends practice for [Sunday service] on Thursday nights," and "manages church's website"; "is able to cook, clean his apartment, use public transportation, and shop in stores"; and "has report[ed] walking daily and losing weight from walking and riding his bike."  Tr. 32.

The ALJ found the medical expert's opinion regarding "standing and walking for one hour each in an eight-hour workday" to be persuasive.  Tr. 35.  The ALJ explained that the opinion was "well supported as it is based on a review of the entire record" and "consistent with the record," including Plaintiff's "loss of sensation in his feet and reports of chronic pain associated with his diabetes mellitus, which would be expected to cause pain with prolonged time on his feet."   Tr. 35.  It was also consistent with Plaintiff's "intact gait," "rare findings of mild edema," "somewhat sporadic treatment and lack of reports of significant pain, and his ongoing intact activities of daily living."  Tr. 35-36.

As for Dr. Hellweg, the ALJ found the majority of his opinion, including the standing and walking limitations and occurrence of absenteeism, to be "poorly supported."  Tr. 36; *see* Tr. 37.  The ALJ explained:

> Notably, Dr. Hellweg indicates [Plaintiff] has had falls with injuries in the past, has diminished balance and proprioception while performing Romberg testing, and

> diminished reflexes and diminished sensation.  However,
> other than noted diminished sensation in the feet, his
> treatment notes do [sic] contain such findings.  In fact, his
> notes contain very limited physical examination findings.
> Those that do exist have generally noted no edema.  I also
> note that when [Plaintiff] presented for completion of opinion
> forms, Dr. Hellweg noted [Plaintiff's] subjective report of
> symptoms but documented no objective examination findings.

Tr. 36 (citations omitted).

The ALJ additionally explained that Dr. Hellweg's opinions were "not consistent with the record, including findings by other providers."  Tr. 36.  The ALJ reiterated that, "while [Plaintiff] does have consistent sensation loss documented, he does not have consistent findings of edema, reflex loss, strength loss, balance difficulties, or gait abnormalities."  Tr. 36.  The ALJ observed that there was "no evidence of [Plaintiff] having difficulty sitting for prolonged periods," noting that Plaintiff "has not reported this to providers," "there are no objective observations of this," and "[t]he nature of [Plaintiff's] impairments do not intuitively support such a limitation."  Tr. 36.  The ALJ again observed that Plaintiff's "condition is noted to be improving with ongoing treatment compliance."  Tr. 36.

As to the standing and walking limitations in particular, the ALJ found them to be "imprecise and vague," noting "[i]t is not clear whether [Dr. Hellweg] is of the opinion that [Plaintiff] could stand/walk for no time or just shy of two hours."  Tr. 37.  The ALJ additionally remarked that Plaintiff "does not require an assistive device to ambulate" and, "contrary to Dr. Hellweg's report, there is no objective evidence of ongoing falls or balance problems," again pointing out that Plaintiff "has . . . consistently been noted to

39

have intact strength in his lower extremities." Tr. 37.  As a result, the ALJ found "the more precise limitation related to time on feet proposed by [the medical expert] to be more persuasive." Tr. 37.  With respect to absenteeism, the ALJ found Dr. Hellweg's opinion to be "speculative in nature and not consistent with any evidence in the record." Tr. 37.

### 4.  Standing & Walking Limitations

"Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties." 20 C.F.R. § 404.1567(a); *accord* 20 C.F.R. § 416.967(a).  A job is sedentary "if walking and standing are required occasionally."  20 C.F.R. § 404.1567(a); *accord* 20 C.F.R. § 416.967(a).  "The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately 2 hours during an 8-hour workday."  Social Security Ruling 96-9p, *Titles II & XVI: Determining Capability to Do Other Work-Implications of A Residual Functional Capacity for Less Than A Full Range of Sedentary Work*, 1996 WL 374185, at *6 (Soc. Sec. Admin. July 2, 1996); *see also id.* at *3 ("'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.").  "If an individual can stand and walk for a total of slightly less than 2 hours per 8-hour workday, this, by itself, would not cause the occupational base to be significantly eroded."  *Id.* at *6.

Plaintiff's argument that the ALJ erred by not adopting the standing and walking limitations identified by Dr. Hellweg is largely a challenge to the ALJ's determination of the persuasiveness of these opinions.  Under the relevant regulations, Dr. Hellweg's

40

opinions are not entitled to special deference. *Bowers*, 40 F.4th at 875; *see* 20 C.F.R.

§§ 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including

controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from your medical sources."), 416.920c(a) (same).

> Instead, ALJs evaluate the persuasiveness of medical
> opinions by considering (1) whether they are supported by
> objective medical evidence, (2) whether they are consistent
> with other medical sources, (3) the relationship that the
> source has with the claimant, (4) the source's specialization,
> and (5) any other relevant factors.

*Bowers*, 40 F.4th at 875; *accord Austin*, 52 F.4th 728; *see generally* 20 C.F.R.

§§ 404.1520c(c), 416.920c(c) (listing factors). "The first two factors—supportability

and consistency—are the most important." *Bowers*, 40 F.4th at 875; *accord Austin*, 52

F.4th at 723; *see* 20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2).

Plaintiff focuses on the fact that the medical expert did not examine him whereas

Dr. Hellweg did. The existence of an examining relationship remains a factor to be

considered when evaluating the persuasiveness of a medical opinion. 20 C.F.R.

§§ 404.1520c(c)(3)(v) ("A medical source may have a better understanding of your

impairment(s) if he or she examines you than if the medical source only reviews evidence

in your folder."), 416.920c(c)(3)(v) (same). The ALJ appreciated that Dr. Hellweg had

examined Plaintiff, noting findings from those examinations. *See* Tr. 30-31.

Yet, supportability and consistency remain the most important factors in

considering the persuasiveness of a medical opinion. When determining the

persuasiveness of Dr. Hellweg's opinions and their supportability, the ALJ also pointed

out that the notes from those examinations did not contain the findings listed by Dr. Hellweg in support of the limitations in Plaintiff's abilities to walk and stand.  Tr. 36; *contra* Tr. 2950.  The ALJ commented that Dr. Hellweg's notes in fact "contain very limited physical examination findings" and those that did exist "generally noted no edema."  Tr. 36.  The ALJ likewise correctly observed that, "when [Plaintiff] presented for completion of opinion forms, Dr. Hellweg noted [Plaintiff's] subjective report of symptoms but documented no objective examination findings."  Tr. 36; *see* Tr. 2940-41. Similarly, the ALJ properly considered whether Dr. Hellweg's opinions were consistent with other evidence in the record, noting that "while [Plaintiff] does have consistent sensation loss documented, he does not have consistent findings of edema, reflex loss, strength loss, balance difficulties, or gait abnormalities."  Tr. 36.  The Court concludes that the ALJ more than adequately evaluated the persuasiveness of Dr. Hellweg's opinions and had sufficient grounds to conclude that those opinions were unpersuasive. *Austin*, 52 F.4th at 729.

Moreover, to the extent Plaintiff focuses on evidence in the record reflecting decreased sensation in his lower extremities due to peripheral neuropathy and the associated pain, the ALJ expressly considered the resulting impact on Plaintiff's abilities to stand and walk.  The ALJ limited Plaintiff to one cumulative hour each of standing and walking, at 30-minute intervals, based on Plaintiff's "peripheral neuropathy from poorly controlled diabetes mellitus, which limits [Plaintiff's] ability to stand and walk for prolonged periods," repeatedly noting the documented "loss of sensation in his feet."  Tr. 28; *see also* Tr. 31 ("[B]ased on [Plaintiff's] long-term loss of sensation to his feet and

occasional reports of numbness and pain in his lower extremities . . . , I have found [Plaintiff] to be limited concerning standing and walking . . . .").

Plaintiff further asserts that "[n]oticeably absent from the ALJ's decision is any discussion of the 'supporting explanations' given by [the medical expert]." Pl.'s Mem. in Supp. at 45. Again, the regulations define supportability as "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) (same). According to Plaintiff, "[a] review of the hearing [transcript] reve[a]ls that[] no supporting explanation was given [by the medical expert] for the [residual functional capacity] provided." Pl.'s Mem. in Supp. at 45.

Plaintiff is partially correct. It is true that, at least initially, the medical expert did not explain the basis for his testimony that Plaintiff would be limited to "standing and walking one hour each total in an eight-hour workday." Tr. 75. The medical expert merely identified the relevant limitations in response to the question posed by the ALJ: "What functional limitations do you believe that the [Plaintiff] would have given his impairments?" Tr. 75. On cross examination, however, the medical expert explained that the standing and walking limitations were based on Plaintiff's neuropathy and associated pain. Tr. 79; *see also* Tr. 81.

The Court concludes the ALJ's finding that Plaintiff was not as limited in his abilities to stand and walk as opined by Dr. Hellweg is supported by substantial evidence in the record as a whole.

### 5. Absenteeism

Lastly, Plaintiff asserts that the ALJ erred by not adopting the limitation that he would be absent from work more than two days per month.

One of the considerations in assessing a claimant's residual functional capacity is "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." Social Security Ruling 96-8p, *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *5 (Soc. Sec. Admin. July 2, 1996). When excessive absenteeism is caused by a claimant's impairment(s), a claimant "is entitled to have it considered by the vocational expert." *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998).

Dr. Hellweg opined that Plaintiff would be absent from work more than four days per month as a result of his impairments or treatment as did Moll. At the first hearing, the vocational expert testified that the tolerance for absenteeism would be "no more than one day per month" and that "includ[ed] coming in late or leaving early." Tr. 111. Thus, were Plaintiff to be absent from work more than one day per month due to his impairments or treatment, he would effectively be disabled.

The ALJ found Dr. Hellweg's and Moll's opinions on absenteeism to be unpersuasive. As to Dr. Hellweg, the ALJ concluded his opinions on absences were

"speculative in nature and not consistent with any evidence in the record." Tr. 37.  As to

Moll, the ALJ pointed out that Plaintiff had "lost his last two jobs for misconduct[,] not

for impairment[-]related reasons."  Tr. 38.  As has been discussed at length above, the

ALJ thoroughly considered the opinions of both Plaintiff's physician and his psychologist

and had sufficient grounds to conclude that the degree of limitation present in those

opinions was largely (Dr. Hellweg), if not entirely (Moll), unpersuasive based on the lack

of supportability, inconsistency with other evidence in the record, and Plaintiff's daily

activities.

Plaintiff provides three, essentially one-line reasons why the record supports an

absenteeism limitation.   First, Plaintiff asserts that an absenteeism limitation is

"supported by [his] reports of significant pain."  Pl.'s Mem. in Supp. at 43.  Respectfully,

"[w]hile pain may be disabling if it precludes a claimant from engaging in any form of

substantial gainful activity, the mere fact that working may cause pain or discomfort does

not mandate a finding of disability." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011)

(quotation omitted).  Second, Plaintiff asserts that an absenteeism limitation "is supported

by repeated . . . [bouts] of nausea and fatigue."  Pl.'s Mem. in Supp. at 43.  Plaintiff has a

history of nausea and fatigue and there were times where Plaintiff continued to report

such symptoms.   There were also times, however, when Plaintiff denied having any

nausea and vomiting.   And with more consistent treatment, Plaintiff's nausea was

reduced.

Third, Plaintiff asserts that an absenteeism limitation "is supported by [his] mental

impairments."  Pl.'s Mem. in Supp. at 43.  Some of the citations to the record provided by

45

Plaintiff merely reflect his diagnoses of depression and anxiety disorder. *See, e.g.*, Tr. 719, 724. Other citations refer to points in time in which Plaintiff experienced a higher degree of depressive symptoms and increased anxiety as well as his approximately 10-day hospitalization between October and November 2016 for suicidal thoughts. *See, e.g.*, Tr. 639, 656-57, 883, 891-98. *See Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) ("not surprising" claimant "can point to some evidence which detracts from the Commissioner's determination" in lengthy administrative record). At the same time, Plaintiff's own citations refer to times in which he experienced a significantly improved mood and was doing better. *See, e.g.*, Tr. 718, 723. It cannot be denied (and in fact, was not denied by the ALJ) that there were certainly periods of time in which Plaintiff experienced exacerbations of his symptoms. *See, e.g.*, Tr. 38 (noting "2016 was something of a low point for [Plaintiff] and not indicative of his sustained functioning"). There is substantial evidence in the record as a whole, however, to support the ALJ's finding that Plaintiff's "functioning has improved significantly over time, with a marked improvement noted with the cessation of [his] opiate abuse," Tr. 32, as reflected in "his relatively intact mental status examination[s], reports of stability and improvement from [his] treatment providers, and [his] good activities of daily living," Tr. 35.

The Court therefore similarly concludes that the ALJ's determination regarding Plaintiff's degree of absenteeism is supported by substantial evidence in the record as a whole.

## V. ORDER

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgement, ECF No. 14, is **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 20, is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March___20___, 2023                    _____*s/ Tony N. Leung*_____
                                              Tony N. Leung
                                              United States Magistrate Judge
                                              District of Minnesota


                                              *Zachary J. E. v. Kijakazi*
                                              Case No. 22-cv-101 (TNL)